# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LANARD TOYS LIMITED, | No. CV 05-8406-GW (JWJx) |
| Plaintiffs, | RULINGS ON: 1) MOTION FOR JUDGMENT AS A MATTER OF LAW, |
| v. | 2) MOTION TO AMEND JUDGMENT OR IN THE ALTERNATIVE FOR A |
| NOVELTY, INC., et al., | NEW TRIAL, 3) MOTION FOR ATTORNEY'S FEES AND NON- |
| Defendants. | TAXABLE COSTS, AND 4) MOTION TO STRIKE BILL OF COSTS AND |
| | RETAX COSTS |

## I.    INTRODUCTION

The jury in this action reached a verdict finding that: 1) Plaintiff Lanard Toys Limited (henceforth "Plaintiff" or "Lanard") held valid copyrights in the following items: Drop Copter toy, Drop Copter packaging, High Flyers toy, Stunt Plane toy and Wild Copters toy (collectively "the Products"); 2) Defendants Novelty, Inc. (henceforth "Novelty"), Novelty Wholesale, Inc. (henceforth "Novelty Wholesale"), Novelty Transportation, Inc. (henceforth "Novelty Transportation") and Exxon/Mobil Oil Corporation (henceforth "Exxon") had infringed Plaintiff's copyrights in the Products; 3) with the exception of Exxon, the Defendants' infringement was intentional; 4) statutory damages for copyright infringement for the Wild Copters toy were awarded in the sum of $150,000 as to each of the Novelty Defendants and in the amount of $200 as to Exxon; 5) actual damages incurred with respect to the remaining products were: $1,200 as to the Drop Copter packaging, $1,200 as to the Drop Copter toy, $2,100 as to the High Flyers toy and $2,100 as to the Stunt Plant toy; 6)

each Defendant's profits attributable to their infringing Shoot Copter and Pull-n-Launch Plane Set (henceforth "Pull-n-Launch") (collectively the "Infringing Products")[1] toys were: (a) as to Novelty, $6,800 for the Shoot Copter and $6,480 for the Pull-n-Launch, (b) as to Novelty Wholesale, $760 for the Shoot Copter and $720 for the Pull-n-Launch, and (c) $0 as to Defendants Novelty Transportation and Exxon; 7) Plaintiff owned a valid trade dress as to each of the Products; 8) the Defendants infringed Plaintiff's trade dress in the Products; 9) with the exception of Exxon, the trade dress infringements were willful; 10) the amount of actual damages (apart from the actual damages already awarded for the copyright infringement) due to Defendants' infringement of the trade dress in Plaintiff's Products was $0; and 11) the amount of each Defendant's profits attributable to trade dress violations by the Infringing Products (excluding any "duplicative" profits already awarded under the copyright infringement claim) were $0 as to the Novelty Defendants and, as to Exxon, were $1,017 for the Shoot Copter and $2,851 for the Pull-n-Launch. See Verdict Form filed on June 6, 2007.  On August 3, 2007, a Judgment consistent with the jury's verdict was entered.

The parties have filed a number of post-trial motions.  First, Defendants move for a judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure (henceforth "FRCP") on the following grounds: 1) the jury's findings of a copyright violation as to the Wild Copters toy[2] should be set aside and a judgment entered for Defendants because "[t]he only part of the 'work' allegedly copied was the lower part of the

---

[1]    As previously noted by Judge Snyder on page 2 of her Order Denying Plaintiffs' Motion for Partial Summary Judgment filed on February 8, 2007 (henceforth "2/8/07 Order"), see Lanard Toys, Ltd. v. Novelty, Inc., 511 F.Supp.2d 1020 (C.D. Ca. 2007):

> Plaintiffs allege that defendants intentionally infringed plaintiffs' intellectual property rights in the Drop Copter," through the sale and offering for sale of Novelty's "Shoot Copter" toys, which plaintiffs allege are "knock-offs" of plaintiffs' proprietary toy and packaging. [First Amended Complaint at ¶ 28] In addition, plaintiffs allege that defendants infringed specific elements of the distinctive design of each of plaintiffs' "Wild Copters," "Stunt Plane," and "High Flyers" toys through the sale and offering for sale of Novelty's "Pull-N-Launch Plane Set" toy. Id. ¶¶ 37.

[2]    The Wild Copters toy referenced in the Verdict Form is the same item (and is sometimes referred to) as "Prop Shots Toy Helicopter."

handle of the launcher of Plaintiff's Toy, which, as a matter of law, is not subject to copyright protection because it is a 'useful article'/functional"; 2) there was no evidence to support the jury's finding of a "willful" copyright infringement; 3) there was no evidence to support a finding of a "willful" trade dress infringement, and such a finding is only necessary in relation to whether this action is an "exceptional case" under 15 U.S.C. § 1117(a) "which is a question of law not tethered to the jury's special verdict" and for which no appropriate instruction was given; 4) the finding of infringement as to Plaintiff's toys must be vacated because the only similarities relate to shapes which are functional or to elements which fall within the definition of "useful articles"; and 5) the award of actual damages to Plaintiff must be set aside as Lanard Toys, Inc. (henceforth "LTI") was the owner of the copyrights when the infringement occurred and Plaintiff was only assigned the copyrights in November of 2005.[3]

Second, Defendants also move pursuant to Rule 59(e) of the FRCP to amend the judgment or, in the alternative, for a new trial.  The grounds for moving to amend are: 1) there is no evidence to support the findings of infringement by Defendants Novelty Wholesale and Novelty Transportation; 2) the declaratory relief portion of the Judgment was incorrect in finding in Lanard's favor as to each of Defendants' counterclaims because it was inconsistent with the 2/8/07 Order which found in Defendants' favor as to the packaging of the Wild Copter, Stunt Plane and High Flyers toys; 3) Plaintiff's prior election of statutory damages as to its copyright claims barred any award of actual damages; and 4) the absence of evidence of distinctiveness and non-functionality required vacating the Judgment on the trade dress claims.  The bases for Defendants' moving for a new trial were: 1) the Court purportedly made erroneous evidentiary rulings as to - (a) allowing testimony as to claims of infringement from third parties against Novelty, (b) refusing to allow responsive testimony from Todd Green on that subject, (c) allowing "fundamentally flawed" expert testimony from Plaintiff's expert Howard Marylander and (d) allowing Plaintiff to proffer

---

[3]   Lanard is a Hong Kong corporation.  LTI is a Missouri corporation.  LTI is a subsidiary of Lanard.

1  a surprise witness (i.e. James Dwyer); 2) the jury instructions contained errors as to - (a) the

2  definition of "willful", and (b) allowing an adverse inference as to Exxon's failure to produce

3  a witness pursuant to a trial subpoena; 3) the special verdict form omitted a material issue

4  over Defendants' objections; and 4) Defendants' request for remittitur.

5       Third, Plaintiff moved for attorneys' fees in the amount of $914,562.12 and "non-

6  taxable" costs[4] in the amount of $147,630.88.

7       Fourth, Defendants moved to strike Plaintiff's Bill of Costs in its entirety due to

8  Plaintiff's purported "intentional misrepresentations" and because Lanard was not a

9  "prevailing party."  Defendants also attacked Plaintiff's request for costs as to the specific

10  categories concerning fees for: 1) service of summons, 2) court reporter, 3) printing costs and

11  4) "exemplication" costs.

12  **II.   DISCUSSION**

13       **A.  Motion For Judgment As A Matter of Law**

14            **1.  Applicable Law**

15       As stated in Rule 50(a), a court should render a judgment as a matter of law when "a

16  party has been fully heard on an issue and there is no legally sufficient evidentiary basis for

17  a reasonable jury to find for that party on that issue."  The Supreme Court in Reeves v.

18  Sanderson Pluming Products, 530 U.S. 133, 150 (2000), held:

19              . . . the standard for granting summary judgment "mirrors" the
            standard for judgment as a matter of law, such that "the inquiry
20          under each is the same."  *Anderson v. Liberty Lobby, Inc.*, 477
            U.S. 242, 250-51 (1986); see also *Celotex Corp. v. Catrett*, 477
21          U.S. 317, 323 (1986).  It therefore follows that, in entertaining a
            motion for judgment as a matter of law, the court should review
22          all of the evidence in the record.
               In doing so, however, the court must draw all reasonable
23          inferences in favor of the nonmoving party, and it may not make
            credibility determinations or weigh the evidence.

24  As observed in Johnson v. Paradise Valley United Sch. Dist., 251 F.3d 1222, 1227 (9th Cir.

25  2001):

26

27  _____

28       [4]   Plaintiff indicated that "costs, or any category of costs, that are automatically taxable as a matter of right by
the clerk under the Federal Rules of Local Rules have not been included or duplicated in this motion."

A jury's verdict must be upheld if it is supported by substantial evidence. Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe, and may not substitute its view of the evidence for that of the jury.

## 2. <u>Copyright Infringement of the Wild Copter/Prop Shots Toy Helicopter</u>

Defendants first move for judgment as a matter of law on the claim of infringement as to the Wild Copter/Prop Shots Toy Helicopter copyright (VA-656-310). The only portion of the Prop Shots Toy Helicopter that Plaintiff claimed was infringed is the handle of the launcher. Defendants argue that the handle is a "useful article" and cannot be included in the scope of the copyright. Plaintiff responds by contending: 1) that the "useful article" rule applies only to products as a whole and not their component parts, and 2) that toys by definition are not useful articles.

Except for boat hulls, <u>see</u> 17 U.S.C. §§ 1301-1332, Congress has never extended copyright protection to the design of useful articles. 17 U.S.C. § 101 provides in part:

> ["Pictorial, graphic and sculptural works"] shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.
>
> \*   \*   \*   \*   \*
>
> A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article."

Initially, this Court rejects Plaintiff's arguments. Lanard contends that the "useful article" rule does not apply to the component parts of a copyrighted work. This contention, however, is absurd. The statutory definition states only that "[a]n article that is normally a part of a useful article is considered a 'useful article'" (17 U.S.C. § 1010); it does not say the opposite - <u>i.e.</u>, that utilitarian aspects of otherwise copyrightable works are protectable by copyright. Lanard also asserts that, because the launcher handle "participates in the portrayal

of the real object and is not useful for anything else," it must be protectable.  That syllogism is not persuasive.  The fact that the disputed portion of the launcher has an intrinsic utilitarian function (as a handle) will normally preclude copyright protection as to its mechanical or utilitarian features.  See Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 915 fn. 13 and concomitant text (2nd Cir. 1980).  Similarly, this Court rejects Lanard's argument that toys (or, by extension, parts of toys) never have a utilitarian function.  While the Sixth Circuit has written that "a toy airplane is merely a model which portrays a real airplane"and therefore has no intrinsic utilitarian function, Gay Toys, Inc. v. Buddy L Corp., 703 F.2d 970, 973 (6th Cir. 1983), the discussion in Gay Toys involved the question whether toys qua toys were useful articles, which is not the question here.  In Durham Industries, Inc., 630 F.2d at 915, the Second Circuit held that features of games that had been copied "related solely to the mechanical, utilitarian aspects of the toys" and were not protected by copyright. See Vol. 1 Nimmer On Copyright, § 2.18[H][1] at 2-204.12 to 204.13 (2007) (henceforth "Nimmer").

Defendants contend that the handle of the Prop Shots Toy is a "mechanical device"/ "useful article" because it exists to allow the user to hold the launcher and pull the attached ripcord and its shape (i.e., curved grip with horizontal grooves) is designed merely to serve that function.  That assertion can be the beginning of the analysis, but not its end.[5]  As noted in Chosun International, Inc. v. Chrisha Creations, Ltd., 413 F.3d 324, 328 (2nd Cir. 2005):

> But while "useful articles," taken as a whole, are not eligible for copyright protection, the individual design elements comprising these items may, viewed separately, meet the Copyright Act's requirements.  Specifically, if a useful article incorporates a design element that is physically or conceptually separable from the underlying product, the element is eligible for copyright protection.  See 17 U.S.C. § 101 . . . . For this reason, one may not copyright the general shape of a lamp, because its overall shape contributes to its ability to illuminate the reaches of a room.  But one can copyright the fanciful designs imprinted on,

---

[5]     For example, in Kieselstein-Cord v. Accessories By Pearl, Inc., 632 F.2d 989, 991-94 (2nd Cir. 1980), it was held that a belt buckle, which was sold as a functional item (as noted by the dissent in that case - to help "to keep the top of trousers at waist level"), was nevertheless copyrightable despite being a useful article, because it had aesthetic sculptural features which could be identified and did exist separately from the utilitarian aspects of the product.

or carved into, the lamp's base, so long as those designs are unrelated to the lamps utilitarian function as a device used to combat darkness.  See Mazer v. Stein, 347 U.S. 201 (1954).

Accord Fabrica Inc. v. El Dorado Corp., 697 F.2d 890, 893 (9th Cir. 1983) (". . . if an article has *any* intrinsic utilitarian function, it can be denied copyright protection except to the extent that its artistic features can be identified separately and are capable of existing independently as a work of art.").[6]

The Ninth Circuit has rejected the argument that "the usefulness of an article for which copyright protection is sought is question of law" which must always be resolved by the court.  See Poe v. Missing Persons, 745 F.2d 1238, 1242 (9th Cir. 1984).  As stated in Boyds Collection, Ltd. v. Bearington Collection, Inc., 365 F.Supp.2d 612, 617 (M.D. Pa. 2005):

> Classification of a design as a "useful article" is not an all-or-nothing proposition; the issue must be addressed on a case-by-case basis. * * * * The line between useful article and creative art is gray and cannot often be drawn in distinct strokes.

Here, Defendants raised functionality/useful article as an affirmative defense.  See page 7 of Answer; also page 30 of the morning session of the May 29, 2007 trial transcript (henceforth "May 29 MSTT").[7]  Generally, the party raising an affirmative defense has the burden of proof of establishing it.  See Cal. Sansome Co. v. U.S. Gypsum, 55 F.3d 1402, 1406 (9th Cir. 1995).  Likewise, as noted in Vol. 3 Nimmer § 12.11[B] at 12-200 and 200.1:

> . . . a copyright registration certificate creates a *prima facie* presumption as to the validity of the copyright.  Given that the *prima facie* presumption is, of course, rebuttable, the burden therefore rests on the defendant to prove the invalidity of plaintiff's copyright.  As a matter of ordering the burdens and presentation of proof, "[t]he plaintiff should not ordinarily be forced in the first instance to prove all of the multitude of facts that underline [sic] the validity of the copyright unless the defendant, by effectively challenging them, shifts the burden of doing so to the plaintiff." [Footnotes omitted.]

---

[6]   Compare Vol. 1 Nimmer § 2.08[B][3] at 2-90, where it is observed that the Supreme Court's "Mazer opinion can be read to mean that any useful article, at least if it is aesthetically pleasing in appearance, is subject to copyright protection with respect to its form."

[7]   The transcript of the trial has been placed in volumes by date and whether it was a morning session or afternoon session.  Henceforth, citation to the transcript will be by the date plus the abbreviation "MSTT" for the "morning session of the trial transcript" or "ASTT" for the "afternoon session of the trial transcript."

17 U.S.C. § 410(c) provides that:

> In any judicial proceedings the certificate of registration made before or within five years after the first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. The evidentiary weight to be accorded the certificate of a registration made thereafter shall be within the discretion of the court.

At the trial, Plaintiff entered into evidence the Certificate of Registration for its Copyright VA-656-310 as to the Wild Copters/Prop Shots Toy Helicopter. See page 59 of May 29 MSTT. That document states that the registration was made in October of 1994 and the date of the first publication was January 1, 1992. While there was testimony that Plaintiff began selling its "Prop Shots" line of toys in 1982 (see e.g., pages 70-71 of May 25 ASTT) and that certain of the models sold during the relevant period of time were "based" upon earlier versions of the toys (see e.g., pages 117-18 of the May 29 MSTT), there was also testimony by Mark Tebbe (a "senior level designer" and later "director of product design" at Lanard) that in the early 1990's he "developed the design for the [Wild Copters] launcher as well as the bodies of the plane." See pages 100-10 of May 29 MSTT. He also explained that: 1) the launcher contained a "mechanical mechanism" inside that propels the helicopter portion of the toy; 2) "the outside of the launcher could be designed any number of ways as long as you fit the mechanism inside," 3) the launcher did not have to be designed the way it was in order for that product to work; and 4) [i]t could be designed a "million ways." Id. at pages 107-10. Tebbe also testified that Defendants' toy handle in dispute simply took the launcher designs from two of the Lanard's Prop Shots toys. Id. at pages 127-29.

The jury was instructed inter alia that: 1) Plaintiff bore the burden of proving that it was the owner of a valid copyright as to the item (see Jury Instructions Numbers 3 and 24); 2) while a copyrighted item can be a sculptured work such as a toy, the "design of a useful or functional object which is ordinarily not copyrightable can be considered a . . . sculptured work only if, and only to the extent that, such design incorporates . . . sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian

aspects of the article" (<u>Id.</u> at No. 27); 3) Defendants bore the burden of proving their affirmative defense that the functional elements of Plaintiff's toys were not subject to copyright protection and that any similarity between Defendants' products and Plaintiff's works were limited to such functional elements (<u>Id.</u> at No. 3); and 4) that a Certificate of Registration made before or within five years after the first publication of the work constitutes prima facie evidence of the validity of the copyright and of the facts stated in the certificate (<u>Id.</u> at No. 32).

As noted in <u>Poe</u>, 745 F.2d at 1243, relevant evidence as to issue of functionality/ useful article includes: 1) expert testimony "concerning the usefulness of the article and whether any apparent functional aspect can be separated from the artistic aspects," 2) evidence of the designer's intent when designing the article, 3) testimony concerning "the custom and usage" of such objects in the particular industry or area of commerce, and 4) evidence of marketability of the item as a work or object of art. At trial, Defendants did not present any expert testimony or other substantial evidence as to those subjects. Such nonfeasance could understandably be perceived by the jury as a failure to meet the burdens of proof and/or persuasion. The jury found in Plaintiff's favor.

In light of the above, this Court again concludes that Defendants were not entitled to judgment as a matter of law on Lanard's copyright infringement claim as to the Wild Copters/Prop Shots Toy Helicopter based upon a functionality/useful article argument.

### 3. <u>Willful Copyright Infringement</u>

17 U.S.C. § 504(c)(2) provides, in part, that "[i]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000." As observed in <u>Peer Intern. Corp. v. Pausa Records, Inc.</u>, 909 F.2d 1332, 1335 n. 3 (9th Cir. 1990), "[n]either the Copyright Act or its legislative history defines 'willful.'" Generally, "'willful' within the meaning of § 504(c)(2) means 'with knowledge that the defendants' conduct constitutes copyright infringement.'" <u>Columbia Pictures Television v. Krypton Broadcasting</u>, 106 F.3d 284, 293 (9th Cir. 1997), *rev'd on other*

*grounds in* <u>Feltner v. Columbia Pictures Television, Inc.</u>, 523 U.S. 340 (1998).  However, willfulness of copyright infringement may be actual or constructive; and it need not be proven directly but may be inferred from the infringer's conduct.  <u>N.A.S. Import, Corp. v. Chenson Enterprises, Inc.</u>. 968 F.2d 250, 252 (2nd Cir. 1992).  "The determination whether a particular infringer acted willfully is left to the trier of fact, although a finding of willfulness should ordinarily be made when the defendant knows that its conduct is an infringement <u>or is reckless in not knowing that fact</u>.  [Emphasis added.]"  <u>Video Views, Inc. v. Studio 21, Ltd.</u>, 925 F.2d 1010, 1021 (7th Cir. 1991); <u>see also</u> Vol. 4 <u>Nimmer</u> § 14.04[B][3][a] at 14-79 & 80 (". . . one who 'recklessly disregards' a copyright holder's rights, even if lacking actual knowledge of infringement, may be subject to enhanced damages.  Such reckless disregard can be inferred from a past practice of infringing other work or from other circumstances. [Footnotes omitted.]").[8]

Defendants argue that the jury's finding of willful copyright infringement was erroneous "as a matter of law" because "[f]or infringement to be 'willful' the infringer must have had notice or knowledge that its conduct was infringing."  Defendants' contention is

---

[8]   As stated in <u>In re Seagate Tech., LLC</u>, 497 F3d. 1360, 1370-71 (Fed. Cir. 2007), <u>cert</u>. <u>denied</u>, ___ U.S. ___, 2008 U.S. LEXIS 2153 (February 25, 2008):

> . . . our sister circuits have employed a recklessness standard for enhancing statutory damages for copyright infringement.  * * * *  Although the statute does not define willful, it has consistently been defined as including reckless behavior.  See, e.g., <u>Yurman Design, Inc. v. PAJ, Inc.</u>, 262 F.3d 101, 112 (2d Cir. 2001) ("Willfulness in [the context of statutory damages for copyright infringement] means that the defendant 'recklessly disregarded' the possibility that 'its conduct represented infringement.'") (quoting <u>Hamil Am., Inc. v. GFI, Inc.</u>, 193 F.3d 92, 97 (2d Cir. 1999) (additional citations omitted)); <u>Wildlife Express Corp. v. Carol Wright Sales</u>, 18 F.3d 502, 511-12 (7th Cir. 1994) (same); <u>RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.</u>, 845 F.2 773, 779 (8th Cir. 1988) (same) . . . .
>
> Just recently, the Supreme Court addressed the meaning of willfulness as a statutory condition of civil ability for punitive damages.  <u>Safeco Ins. Co. of Am. v. Burr</u>, 551 U.S. ___, 127 S.Ct. 2201 (2007).  * * * *  Addressing the willfulness requirement in this context, the Court concluded that the "standard civil usage" of "willful" includes reckless behavior.  <u>Id.</u>, 127 S.Ct. at 2209; accord <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 132-33 (1988) (concluding that willful violations of the Fair Labor Standards Act include reckless violations); <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 128 (1985).  Significantly, the Court said that this definition comports with the common law usage, "which treated actions in 'reckless disregard' of the law as 'willful' violations."  <u>Id.</u>, 127 S.Ct. at 2208 . . . .

10

1   based upon the erroneous assumption that "reckless disregard" at a minimum requires the

2   infringer to be "specifically aware of the owner's asserted rights . . . [and] infringe[s] anyway

3   . . . ." That assertion is clearly contrary to the established law.[9]  See e.g., Vol. 4 Nimmer §

4   14.04[B][3][a] at 14-79 & 80 and cases cited therein; Island Software & Computer Service

5   v. Microsoft Corp., 413 F.3d 257, 264 (2nd Cir. 2005) (". . . our prior decisions clearly

6   recognize that, even in the absence of evidence establishing the infringer's actual knowledge

7   of infringement, a plaintiff can still prove willfulness by proffering circumstantial evidence

8   that gives rise to an inference of willful conduct."); Knitwaves, Inc. v. Lollytogs LTD. (Inc.),

9   71 F.3d 996, 1010 (2nd Cir. 1995) (same); Archlightz and Films PVT. Ltd. v. Video Palace,

10  Inc., 303 F.Supp.2d 356, 362 (S.D.N.Y. 2003) ("Proof of actual knowledge or maliciousness

11  is not required and constructive knowledge is enough.").

12      As to the type of evidence which has been held to be sufficient to potentially establish

13  willful infringement, in Knitwaves, Inc., 71 F.3d at 1010, a finding of willfulness was based

14  upon the defendant's admissions: 1) that it set out to create designs having the same "look"

15  and "feel" as the plaintiff's copyrighted sweaters and 2) that it did not look for copyright

16  notices on the sweaters because it claimed that its designers were attempting to copy only

17  the unprotectable elements of the sweaters.  See also Wildlife Exp. Corp. v. Carol Wright

18  Sales, Inc., 18 F.3d 502, 514 (7th Cir. 1994) (testimony from defendant's chief executive that

19  the company did not conduct copyright searches as to goods imported from abroad but was

20  willing to risk possible infringement as a "cost of doing business").  In N.A.S. Import, Corp.,

21  968 F.2d at 253, it was noted that even before the defendant had received plaintiff's

22  complaining letters, there was evidence of willful infringement based upon the facts that: 1)

23  the infringing handbag buckle was identical to the copyright owner's except for the

24  embossing of the respective company names, 2) the close proximity of the infringer's store

25  to the copyright owner's store, and 3) that the infringer was a seller of handbags "in a market

26

27      [9]    In support of its contention, Defendants rely on Danjaq LLC v. Sony Corp., 263 F.3d 942, 956-59 (9th Cir.
         2001).  However, the issues raised in that case did not involve the subject of reckless disregard or whether notice or
28       actual knowledge of infringement is required as a basis for a willful infringement finding.

rife with knock-offs."   The existence of prior litigation involving a claim of copyright infringement can be considered.   See e.g. Canopy Music Inc. v. Harbor Citi Broadcasting, Inc., 950 F.Supp. 913 (E.D. Wis. 1997).

Here, there was enough evidence for the issue of willfulness to go to the jury.   For example, Todd Green (the president of Defendants Novelty, Novelty Wholesale and Novelty Transportation) testified that Novelty has a practice of sending its employees to retail establishments to look for "hot products" which it would purchase (and/or photograph) and have transmitted to its vendors in China with instructions that "these are the types of products we want."   See pages 20 and 35 of May 29 ASTT.   Novelty does not ask for permission from the sellers or creators of those "hot products" before engaging in that practice which has periodically lead to complaints of improper copying. Id. at 36 and 39-42. While Green testified that such practice was not employed by Novelty as to its disputed Shoot Copter and Pull-n-Launch toys in this case (see Id. at pages 23-24), obviously the jury was free not to accept that testimony based on credibility determinations and other evidence. Green also stated that the toys were purchased from a showroom in China operated by a company called "Concord."   Id.   Normally, Novelty does not make any copyright check as to goods purchased in China and specifically did not do so as to the products in this case. Id. at 59-60 and 64.   Green eventually admitted that he had heard, and did not disagree, that China "is a well-known den for piracy in the toy industry."[10] Id. at 80-81. As stated in In re Aimster Copyright Litigation, 334 F.3d 643, 650 (7th Cir. 2003):

> Willful blindness is knowledge, in copyright law (where indeed it may be enough that the defendant should have known of the direct infringement, Casella v. Morris, 820 F.2d 362, 365 (11th Cir. 1987) * * * *, as it is in the law generally.   See e.g., Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir. 1989) (contributory trademark infringement).   One who, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings is held to

---

[10]   Green was impeached on this point because when initially asked if he was aware that "China is a well-known den for piracy in the toy industry" he answered "No. I'm not." See page 79 of May 29 ASTT. Plaintiff's counsel then read to the jury Green's contrary deposition testimony.   Id. at pages 80-81.

have a criminal intent, <u>United States v. Giovannetti</u>, 919 F.2d 1223, 1228 (7th Cir. 1990), because a deliberate effort to avoid guilty knowledge is all that the law requires to establish a guilty state of mind. [Emphasis in original.]

For the above stated reasons, Defendants' motion for judgment as a matter of law as to the jury's finding of willful copyright infringement is again denied.

### 4.  <u>Willful Trade Dress Infringement</u>

Defendants contend that the judgment should be <u>modified</u> to eliminate the finding of "willful" trade dress infringement because: 1) the "finding only relates to Plaintiff's contention that fees are appropriate because this is an 'exceptional' case under 15 U.S.C. § 1117(a) of the Lanham Act, which is a question of law not tethered to the jury's special verdict,[11] and 2) the special verdict was given without any appropriate instruction. Those contentions are rejected.

First, Defendants' request for a modification of the judgment is not properly made as a motion for judgment as a matter of law.  Second, Defendants did not raise those issues in a pre-verdict motion at trial (where any purported deficiencies could have been remedied), and hence they cannot argue them as a post-verdict matter.  Third, neither Plaintiff nor Defendants requested that the Court give a jury instruction as to the willfulness element for purposes of finding a willful trade dress infringement.  Fourth, the jury was given Instruction No. 52 which did define when an infringement is "willful."  While that instruction did specifically refer to the "copyright owner's rights", there is no indication that the instruction was solely limited to copyright violations and could not be used in the trade dress context. Finally, Defendants have failed to articulate any prejudice should the Court leave unaltered the jury's answer to question number 16 of the verdict form.  <u>See</u> discussion in Section II(D)(2)(b), below.

### 5.  <u>Evidence of Copyright Infringement</u>

---

[11]  But <u>see</u>, <u>Admiral Corp. v. Admiral Employment Bureau, Inc.</u>, 151 F.Supp. 629, 631 (N.D. Ill. 1957) (holding that before the court could consider awarding damages in a sum above actual damages under 15 U.S.C. § 1117(a), "there exists the right to have a jury pass on the question of the wilfullness [sic] of the violation before such an award is made.").

Defendants argue that the only similarity between their toys and Plaintiff's products lay in their shapes, which they contend are purely functional, and hence the evidence was insufficient to support a finding of infringement. Again, the Court disagrees.

Judge Snyder in her 2/8/07 Order previously found that there were genuine issues of material fact as to whether parts of Plaintiff's toys were useful and denied Defendants' motion for partial summary judgment, relegating the matter to the jury. The jury was correctly instructed as to the applicable law and burdens of proof. The jury found in Plaintiff's favor on this issue.[12] "Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. 564, 574 (1985).

### 6. Evidence of Damages

Defendants next argue that the jury's award of $6,600 in actual damages in connection with the infringement of Plaintiff's copyrights in the Drop Copter Toy and Packaging, the High Flyers Toy and the Stunt Plane Toy must be vacated. The copyright owner at the time Novelty sold the infringing toys was LTI. LTI assigned its copyright rights and any claims for infringement to Plaintiff Lanard on November 21, 2005. LTI never sold any products. Novelty claims that any decline in Lanard's sales during the time that it was selling the

---

[12] As stated in Mattel, Inc. v. Goldberger Doll Manufacturing Co., 365 F.3d 133, 136 (2d Cir. 2004):

> The copyright does not protect ideas; it protects only the author's particularized expression of the idea. Thus, Mattel's copyright in a doll visage with an upturned nose, bow lips, and widely spaced eyes will not prevent a competition from making dolls with upturned noses, bow lips, and widely spaced eyes, even if the competitor has taken the idea from Mattel's example, so long as the competition has not copied Mattel's particularized expression. An upturned nose, bow lips, and wide eyes were the "idea" of a certain type of doll face. That idea belongs not to Mattel but to the public domain. But Mattel's copyright will protect its own particularized expression of that idea and bar a competitor from copying Mattel's realization of the Barbie features.

This approach - analogizing to "common features" - is right. It shows that even if Plaintiff's toys are seen as useful objects because they fly and because some of their design features are related to the purpose of flying, the "particularized expression" of their utilitarian features may still be protectable to the extent that they reflect aesthetic decisions and not engineering decisions. Because the jury heard evidence allowing it to conclude that "the artistic aspects of [the toys] can be 'conceptualized as existing independently of their utilitarian function,'" the toys were reasonably found to be capable of being infringed. Pivot Point Int'l, Inc. v. Charlene Prods., 372 F.3d 913, 931 (7th Cir. 2004).

infringing toys in the Spring and Summer of 2005 did not harm LTI.  Therefore, Novelty argues, when LTI assigned its claim for any past cause of action to Lanard, it had no damages to assign.  Moreover, Novelty argues, even disregarding the problem with the assignment, there is no evidence that Lanard suffered any damages because Plaintiff only offered evidence of a decline in sales of the entire Prop Shots line of products (including products that were not infringed).

Novelty's motion offers no explanation for why LTI, as the copyright owner, could not have been damaged by Novelty's sale of the Infringing Products, why the jury could not consider Lanard's decline in sales as a way of measuring harm to LTI, or why it would be unduly speculative for them extrapolate damages resulting from Novelty's infringement from evidence of a decline in sales of the entire product line.  Moreover, Lanard argues that it presented other evidence from which the jury could deduce damages to LTI, and argues further (albeit without citation to the record) that it presented evidence that Novelty's infringement continued after the assignment to Lanard.

Finally, courts have defined "actual damages" as "'the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement.'" Frank Music Corp. V. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 512 (9th Cir. 1985) (quoting Vol. 3 Nimmer on Copyright § 14.02, at 14-6 (1985)).  LTI could have been harmed by Novelty's infringement even if it was not engaged in the sale of its protected works at the time the infringement occurred.

### 7.  Conclusion

In light of the above, Defendants' motion for judgment as a matter of law is denied in its entirety.

## B.  Motion To Amend Or Alter Judgment

### 1.  Applicable Law

FRCP 59(e), which allows a trial court to alter or amend a judgment, does not set forth any specific grounds for such relief.  However, as noted in Zimmerman v. City of Oakland, 255 F.3d 734, 740 (9th Cir. 2001); "Amendment or alteration is appropriate under Rule 59(e)

if (1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in the controlling law." Rule 59(e) motions are addressed to the sound discretion of the trial court and denials of such motions are reviewed for abuse of that discretion. Id. at 737; Pasatiempo by Pasatiempo v. Aizawa, 103 F.3d 796, 801 (9th Cir. 1996).

In their motion to amend/alter judgment, Defendants raised four contentions: 1) there was no evidence to support findings of infringement by Defendants Novelty Wholesale or Novelty Transportation; 2) entries of declaratory judgment with respect to toys previously found not to be infringed should be vacated and partial judgment should be entered in Defendants' favor; 3) the award of actual damages and Defendants' profits on the copyright claims should be vacated because Lanard's prior election of statutory damages may not be withdrawn and constitute waiver; and 4) the absence of evidence of distinctiveness and non-functionality requires vacating the judgment on the trade dress claims.

## 2. **The Liability of Novelty Wholesale and Novelty Transportation**

Defendants Novelty Wholesale and Novelty Transportation argue that this Court should alter or amend the judgment against them on the basis of a lack of evidence to support the finding by the jury of infringement. However, it must initially be noted that a purported dearth of evidence to support a jury's verdict is not one of the normal bases for a motion to amend/alter the judgment. Hence, the current contention raised by those two Defendants would not be a proper ground for altering or amending the judgment.

Nevertheless, as noted in Miller v. Transamerican Press, Inc., 709 F.2d 524, 527 (9th Cir. 1983): "Though [defendant] styled its motion a Rule 59(e) motion, 'nomenclature is not controlling . . . . the court will construe it, however styled, to be the type proper for the relief requested." Because defendants did not raise the contention as a pre-verdict Rule 50(a) motion for judgment as a matter of law, it cannot be treated as a Rule 50(b) post-verdict motion for judgment as a matter of law. Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003); Jones v. Wal-Mart Stores, Inc., 279 F.3d 883, 886-87 (9th Cir. 2002). Nor

16

1  should FRCP 60 be applied herein.[13]  However, the issue can be treated as a motion for a new

2  trial under Rule 59(a).  The Court will address that matter when it considers the Defendants'

3  Rule 59(a) motion.

### 3.  <u>Amending Certain Language in the Judgment</u>

5  As currently worded, the Judgment states in part:

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that, based on findings by the jury, Defendants Novelty, Inc., Novelty Wholesale, Inc., and Novelty Transportation, Inc., willfully infringed Plaintiff's copyrights and trade dress rights.
>
> * * * * *
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that, by reason of this Court's order dated February 8, 2006, and other findings of this Court, judgment is hereby entered in favor of Plaintiff and against Defendants on each of Defendants' counterclaims.

12  Defendants point out that in her 2/8/07 Order, Judge Snyder granted their motion for

13  summary judgment in part on the issue of "plaintiffs' claim for copyright infringement of the

14  'Stunt Plane' packaging, 'High Flyers' packaging, and 'Wild Copters' packaging . . . ."

15  Defendants contend that the above-quoted language of the Judgment is inconsistent with

16  Judge Snyder's ruling.  This Court agrees.

17  The above-quoted paragraphs should be amended to read as follows:

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that, based on findings by the jury, Defendants Novelty, Inc., Novelty Wholesale, Inc., and Novelty Transportation, Inc. willfully infringed Plaintiff's copyrights and trade dress rights in its "Drop Copter" packaging, the "Drop Copter" toy, the "High Flyer's toy, the "Stunt Plane" toy and the "Wild Copters" toy.
>
> * * * * *
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED**, that, by reason of this Court's order dated February 8, 2007, and other findings of this Court, judgment is hereby entered: 1) in favor of Defendants and against Plaintiff on the Defendants' counterclaim for a declaration of non-infringement as to the packaging of the "Stunt Plane," "High Flyers" and "Wild

---

[13]  Novelty Wholesale and Novelty Transportations' contentions do not fall within the enumerated grounds in Rule 60(a) or 60(b)(1) through (5).  While Rule 60(b)(6) is a catch-all provision, it is not to be employed except in extraordinary circumstances which are not presented here.  <u>See Liljeberg v. Health Services Acquisition Corp.</u>, 486 U.S. 847, 863-64 (1988); <u>United States v. State of Washington</u>, 98 F.3d 1159, 1163 (9th Cir. 1996).

Copters" toys, and 2) in favor of the Plaintiff and against the Defendants on the remaining portions of the Defendants' counterclaim.

### 4. Award of Actual Damages and Defendants' Profits

Defendants further move to vacate the judgment with respect to the jury's finding of actual damages of $6,600 and Novelty's plus Novelty Wholesale's combined profits of $14,800 based upon their argument that Lanard had previously waived its rights to recover those amounts by electing to received statutory damages only for all of its copyright claims. That contention is untenable.

As stated in 17 U.S.C. § 504(c)(1): ". . . the copyright owner may elect, <u>at any time before final judgment is rendered</u>, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action [emphasis added] . . . ." At the pre-trial conference on May 7, 2007, this Court considered Defendants' motion in limine number 7 which sought to exclude Plaintiff's proffering any evidence of its actual damages because of an election by Plaintiff to seek statutory damages only. As noted at the hearing, Plaintiff had served on Defendants on November 20, 2006, an amended notice wherein it clearly stated that it would be seeking statutory damages as to its claims based on the Wild Copters toys and packaging and on the Drop Copter packaging, but, as to the rest of its copyrights claims, it would seek actual damages and disgorgement of profits. The Court denied Defendants' motion in limine number 7 finding that Plaintiff's amended notice was timely and Defendant had failed to raise any objection when that amended notice was made in November 2006 at a time when discovery was still on-going, even though the discovery cut-off date had already passed.[14]

---

[14]     Defendants seem to argue that, once a plaintiff makes a damages election before trial, it is forever barred from changing its mind. Defendants cite to <u>Twin Peaks Productions v. Publications Intern. Ltd.</u>, 996 F.2d 1366, 1380 (2nd Cir. 1993), for the proposition but that court merely stated: "Once a plaintiff has selected statutory damages, it has given up the right to seek actual damages and may not renew that right on appeal by cross-appealing to seek an increase in the actual damages." Where, as here, a plaintiff elects to amend its election of damages months prior to trial, when discovery could have been taken on the issue, and where the trial court at the pre-trial conference holds that the plaintiff can proceed on the previously filed amended notice, there is no basis to seek to vacate the jury's award as to statutory and actual damages.

Defendants' last ground for amending/altering the judgment is that Lanard failed to proffer any evidence that: 1) its trade dress was distinctive or had acquired a secondary meaning; 2) its trade dress was non-functional; and 3) there was likelihood of confusion of the *protectable* elements of the trade dress."   Initially, it should be noted that these contentions raised by Defendants do not fall within Rule 59(e) as a basis for amending or altering the judgment.  Further, since Defendants did not raise the arguments at the pre-verdict stage, there is no basis for a post verdict request for a judgment as a matter of law under rule 50(a).   Nevertheless, even assuming <u>arguendo</u> grounds for considering Defendants' arguments on their merits, they must still be rejected.

Jury Instruction No. 43, which was based on Instruction 15.6 in the Ninth Circuit's Manual of Model Civil Jury Instructions (henceforth "Ninth Circuit Instruction"), informed the jury that, for Plaintiff to prevail on its trade dress claims, Plaintiff would have to prove by a preponderance of the evidence, <u>inter alia</u>, that the designs of its purportedly infringed toys and/or packaging were distinctive and nonfunctional, and that Defendants' designs for its toys and/or packaging at issue herein were similar to Plaintiff's designs and used "in a manner that is likely to cause confusion among ordinary purchases as to the source or affiliation of the Defendants' goods . . . ."  Jury Instruction No. 44 (which was based on Ninth Circuit Instruction No. 15.9) indicated that Plaintiff's trade dress was to be examined in the context of a spectrum of distinctiveness from the highest category which is "arbitrary" (involving a "fanciful or unique use of packaging to designate the source of a product" but which in no way describes or has any relevance to the particular product) to "suggestive" (which does not describe the product's function but implies them) to "descriptive" (which contains a direct identification of some aspect, characteristic or quality of the product) to the lowest "generic" (which simply includes common or general indicia with which products of that type are typically identified.  Jury Instruction No. 45 (which was based on Ninth Circuit Instruction No. 15.10) dealt with the concept of "secondary meaning" which was described as follows: "trade dress acquires a secondary meaning when it has been used in such a way that its primary significance in the minds of prospective purchasers is not the product itself,

but the identification of the product with a single source, regardless of whether consumers know who or what that source is."  The jury was told that, in deciding whether an asserted trade dress had acquired a secondary meaning, they should consider: 1) purchasers' perceptions, 2) advertisements, 3) "demonstrated utility" of the trade dress to increase sales, 4) extent of use of the trade dress, 5) exclusivity, 6) whether defendant intentionally copied the trade dress, and 7) actual confusion.  Jury Instruction No. 47 (based on Ninth Circuit Instruction No. 15.16) covered the issue of whether the Defendants' use of the trade dress was likely to cause confusion as to the source of the goods.  Among the possible factors which the jury was told that they could consider were: 1) the strength or weakness of Plaintiff's trade dress, 2) the Defendants' use of similar trade dress on similar or related types of products, 3) the degree of similarity of Plaintiff's and Defendants' trade dress, 4) actual confusion, 5) Defendants' intent, 6) marketing and advertising channels, 7) buyers' sophistication and degree of care when purchasing these types of products, and 8) product line expansion.  The jury was also given Instruction No. 46 (based on Ninth Circuit Instruction No. 15.11), which indicated that a "product feature is functional if it is essential to the product's use or purpose, or if it affects the product's cost or quality . . . . [and], [i]f the feature is part of the actual benefit the consumers wish to purchase when they buy the product, the feature is functional."  In deciding the issue of functionality as to trade dress, the jury was told to assess: 1) the design's utilitarian advantages, which were to be treated as functional (as opposed to mere ornamental, incidental or arbitrary elements which would be nonfunctional), 2) availability of alternate designs, 3) whether the seller advertised the utilitarian advantages of a particular feature or design, and 4) the design's method of manufacture.

While Defendants claim that there was a "complete lack of evidence of distinctiveness or secondary meaning of Plaintiff's alleged trade dress" or nonfunctionality, they are clearly wrong.

As to distinctiveness, the relevant toys and packaging from the Plaintiff and from the Defendants were provided to the jury such that an examination and a comparison of each

item could be made.  That would be enough evidence for the jury to determine where the Plaintiff's trade dress as to its toys and packaging fell on the spectrum of distinctiveness as defined in Jury Instruction No. 44.[15]  As observed in Randall-Jackson Winery v. E. & J. Gallo Winery, 150 F.3d 1042, 1044 n. 2 (9th Cir. 1998); "a products' 'trade dress' is its total image and overall appearance: it includes features such as size, color, color combinations, texture or graphics."  Also, as to trade dress, ". . . the proper inquiry is not whether individual features of a product are functional or non-distinctive but whether the whole collection of features taken together are functional or non-distinctive.  Id. at 1050.

As to secondary meaning and likelihood of confusion, Plaintiff introduced the testimony of Howard Marylander, an expert witness in marketing research who opined on the existence of likelihood of confusion as to the toy buying public between Plaintiff's contested toys and packaging and those of the Defendants.  Likewise, there was testimony from James Hesterberg (Lanard' managing director and its "head of the company") and others regarding other factors delineated in Jury Instruction No. 45 such as the length of time and manner in which Lanard used the claimed trade dress, whether that use was exclusive, whether there was copying of the trade dress by Defendants, etc.

As to non-functionality, Hesterberg and Tebbe testified as to topics covered in Jury Instruction No. 46 which delineated factors to be assessed in deciding whether features are functional or non-functional.  That testimony included which portions of the toy or packaging had a particular use and whether the part was merely ornamental and/or arbitrary, and the existence and number of other alternate designs for sections of the toys.

### 5. Conclusion

In light of the above, Defendant's motion to alter and/or amend the judgment is granted in part as to the declaratory portion, but denied as to the remaining contentions.

---

[15]   It is noted that neither side elected to proffer independent expert testimony on the issues of distinctiveness and non-functionality.

## C. **Motion For A New Trial**

### 1. **Applicable Law**

Pursuant to FRCP 59(a), a district court may grant a new trial to all or any of the parties on all or part of the issues tried.  Rule59(a) does not enumerate the specific grounds on which the court may order a new trial following a jury verdict except to say that it can be "for any of the reasons for which new trials have been granted in actions at law in the courts of the United States . . . ."  "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court.  Where a matter is committed to discretion, it cannot be said that a litigant's right to a particular result is 'clear and indisputable.'"  Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980).

Here, Defendants base this motion on 1) alleged erroneous evidentiary rulings, 2) purported erroneous jury instructions, and 3) the omission of material issues in the special verdict form.  Defendants also raise a "suggestion of remittitur" because the amount of the judgment was supposedly excessive.  Initially, the Court will deal with Defendants' contention that there is no basis for a finding of liability as to Novelty Wholesale and Novelty Transportation.

### 2. **Verdict as to Novelty Wholesale and Novelty Transportation**

Defendants Novelty Wholesale and Novelty Transportation both claim that "there was no evidence to support the jury's findings of infringement by these defendants."[16] Defendants' recollection of the evidence is faulty.

For example, as to Novelty Wholesale, Plaintiff presented parts of the videotaped deposition of Christopher Hupp who was the president of Novelty Wholesale since mid-December 2005.  See page 46 of May 30 MSTT.  He testified that Todd Green was the

---

[16] Defendants further argued that:

> Todd Green, who is president of both companies, testified that neither company ever sold or distributed to the public either the Shoot Copter of the Pull-N-Launch Plane Set. (Rapport Decl. Ex. 1 - Trial Tr. (5/29/07 PM) at 121:3-10).  Even if the jury did not find Mr. Green credible, Lanard proffered *no* evidence of infringing acts by these companies.

owner of the company.   In describing the relationship between Novelty Wholesale and Novelty,  Hupp stated:

> Q     How is Novelty Wholesale related to Novelty, Inc., in a business sense?
>
> A     The best way to describe the relationship is that Novelty Wholesale can utilize much of the work or product that Novelty, Inc., creates.
>
> Q     Would you consider the products marketed and sold by Novelty Wholesale to be higher-end products that [sic] products sold by Novelty, Inc.?
>
> A     No.
>
> Q     Is there a different in the type of products sold by Novelty Wholesale and Novelty, Inc.?
>
> A     No.
>
> Q     Are Novelty Wholesale and Novelty, Inc., working together in such a way that when Novelty Wholesale makes a sale to Dollar General, for example, would Novelty, Inc., directly ship the items to Dollar Green?  This is just an example.
>
> A     Yes, Novelty, Inc., employees would coordinate and ship the product on the behalf of Novelty Wholesale.

Pages 49-50 of May 30 MSTT.

For example, as to Novelty Transportation, Ryan Polk testified that he was the chief financial officer for Novelty and also prepared the finances for the two other companies owned by Todd Green (i.e., Novelty Wholesale and Novelty Transportation).  See page 45 of May 30 ASTT.  He stated that Novelty is the only customer of Novelty Transportation.  Id. at page 126.  Novelty Transportation's sole function is to move Novelty's product from its Greenfield, Indiana warehouse to its route sales representatives in the eastern half of the United States.  Id.  Novelty Transportation received revenue from the delivery of Novelty's toys, such as the infringing Shoot Copter.  Id. at page 127.

The Ninth Circuit has adopted the rule originally stated in Gershwin Publishing Corp. v. Columbia Artists Management, Inc., 443 F.2d 1159, 1162 (2nd Cir. 1971), that "one who, with knowledge of infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer."  See e.g.,

23

Perfect 10, Inc. v. Amazon.com, Inc., 487 F.3d 701, 727 (9th Cir. 2007).  It cannot be disputed that the transportation of infringing copies of a copyrighted work from one location to myriad sales points constitutes distribution of the items and materially contributes to the improper conduct of the infringer.  The issue here is whether there was sufficient evidence from which the jury could find that Novelty Transportation acted with knowledge of the infringing activity.  This Court concludes that there was sufficient material for the issue to go to the jury based, for example, on such evidence as Novelty being Novelty Transportation's sole customer, Todd Green's common ownership of both companies, Todd Green's being an officer of both corporations and his involvement in their operations, etc.

After considering and weighing all of the evidence proffered at the trial, this Court does not conclude that either: 1) a mistake has been committed by the jury in finding against Defendants Novelty Wholesale and Novelty Transportation, see Landes Const. Co. v. Royal Bank of Canada, 833 F.2d 1365, 1371-72 (9th Cir. 1987); or 2) the jury's verdict is against the clear weight of the evidence or constitutes a miscarriage of justice.  Union Oil Co. of Calif. v. Terrible Herbst, Inc., 331 F.3d 735, 742-43 (9th Cir. 2003).  Hence, a new trial will be denied on those grounds.

### 3. **Evidentiary Rulings**

As stated in Ruvalcaba v. City of Los Angeles, 64 F.3d 1323, 1328 (9th Cir. 1995);

> District Courts are granted broad discretion in admitting evidence, and their rulings are reviewed only for an abuse of discretion.  A new trial is only warranted when an erroneous evidentiary ruling "substantially prejudiced" a party.

Defendants raise the following four evidentiary rulings which they contend require a new trial: 1) allowing testimony of third party infringement claims against Novelty, 2) precluding Todd Green from testifying as to those claims, 3) allowing Marylander's testimony regarding public confusion, and 4) permitting Plaintiff to proffer the testimony of "James Dwyer" who was not identified as a potential witness until a few days before trial.[17]

---

[17]   Although Defendants in their moving papers identify the witness as "James Dwyer," as he stated at the trial, his name is Michael Dwyer.  See page 28 of May 30 MSTT.

As to items one, two and four, they relate to the issue of whether Plaintiff could refer to other situations where companies other than Lanard either complained to Novelty or filed lawsuits against Novelty for purportedly violating the copyrights or trade dress as to their products.[18]  At the continuance of the pre-trial conference, this Court <u>tentatively</u> indicated that such evidence was "extremely prejudicial" although it did go to Novelty's knowledge and intent.[19]  <u>See</u> pages 58-59 of the May 24, 2007 trial transcript.  Nevertheless, this Court indicated that it would consider that issue at a hearing under Federal Rules of Evidence ("FRE") 402/403 in the context of Plaintiff's proffering of specific evidence concerning a similar situation where Novelty purportedly violated another company's copyrights with toys purchased form China.  <u>Id.</u> at page 59.  At that hearing, Plaintiff's counsel identified the witness as Michael Dwyer.  This Court ruled that Plaintiff would not be allowed to call Dwyer in their case in chief, but could possibly be able to proffer the testimony in response to the evidence presented by the defense.  <u>See</u> page 37-38 of May 25 MSTT.

During the beginning of Todd Green's testimony, he was asked if Novelty ever had an issue with Disney to which he responded, without objection by defense counsel, that Disney had made a complaint about fifteen years ago.  <u>See</u> page 32 of May 29 ASTT.  He then testified about Novelty's practice of going to retail establishments in the United States and purchasing or taking photographs of products to send to Novelty's vendors in China with language to the effect of "Hey, these are the types of products we want."  <u>Id.</u> at 34-35.  Those actions are taken without seeking permission from the sellers or creators of the products.  <u>Id.</u> at 34-35.  At that point, given that Green's testimony was sufficient for the jury to conclude that Novelty was engaging in what could be considered as "knock-offs" of those products

---

[18]  Defendants' motion in limine number 1 sought to exclude all evidence and reference to other instances or litigation where any defendant was accused of intellectual property infringement.  At the initial pre-trial conference hearing on May 7, 2007, the Court heard the arguments and took the matter under submission.

[19]  As noted in Vol. 4 <u>Nimmer</u> § 14.04[B][3][a] at 14-79 & 80, reckless disregard can be inferred from a past practice of infringing other copyrighted works.

1   (see e.g. Knitwaves, Inc., 71 F.3d at 1010), the Court concluded that the issue of Novelty's

2   knowledge that such practice could violate copyright or trade dress was sufficiently raised

3   so that the Plaintiff's counsel could ask him whether Novelty was ever put on notice that

4   other companies considered that conduct improper by complaining to Novelty.  Hence, the

5   Court overruled defense counsel's objections to questions involving that topic.  See e.g. Id.

6   at page 36.  Green's subsequent response to questions asked both by Plaintiff's counsel on

7   direct and by defense counsel on cross-examination attempted to minimize that Novelty had

8   any knowledge or expectation that its competitors would complain regarding Novelty's

9   practices.[20]

10        In light of Green's testimony, the Court conducted a FRE Rule 402/403 hearing

11   outside of the jury's presence on whether Dwyer could testify.  It held that, based on what

12   Green had stated, Plaintiff could call Dwyer but his testimony would be limited.  See pages

13   27-28 of May 30 MSTT.  In later explaining its rulings, the Court stated:

14            I indicated that that was my original ruling but it would
          depend, obviously, on what was presented at trial because the door
15          could always be opened . . . .
                              * * * * *
16            And your client got up there and made lots of statements
          which all of a sudden made those comments or those instances
17

---

18    [20]   For example, the following exchange occurred on direct examination:

19            Q.    Any other companies or people that have alleged that Novelty took its
          product from the marketplace and then sent it to China to have it redesigned and
20        then sold it, an infringing copy, in the marketplace?  Any other companies or
          people?
21            A.    Yeah.  We bring to market 1200 items a year, right?  We get a complaint
          that: Hey, this is my item.  Absolutely.  Can I name every one of those?  I can't.  I --
22        nearly -- people send us a letter all the time: That's my item.  They really don't have
          a copyright or they don't have -- you know, it's not -- you know, it's not their item.
23        I see my product all over China.

24   See page 58 of May 29 ASTT. Likewise, for example, Green gave the following responses to defense counsel's
     questions:

25            Q.    When you ordered the Shoot Copter from Concord, did you know that
                    Lanard might some day claim that this product infringed?
26            A.    No.
              Q.    To the best of your knowledge, did anyone at Novelty know that Lanard
27                  might claim that it infringed?
              A.    No.
28   Id. at page 142.

1
2

> which I previously would not have allowed in . . . more relevant and less prejudicial because of the fact that they're rebutting his statements that he made on the stand.

3      <u>See</u> page 12 of May 31 MSTT.

4          Further, Defendants argue that this Court refused to allow Green, when he re-took the

5  stand, to testify on those claims which had been brought out by Plaintiff's counsel.

6  Defendants' current contention is exactly the opposite of what transpired. <u>See</u> pages 13-16

7  of May 31 MSTT. At the trial, Plaintiff's counsel only specifically addressed two or three

8  lawsuits which had been brought against Novelty. Defense counsel requested that they be

9  allowed to identify "all of the claims and litigation that has been filed against Novelty." <u>Id.</u>

10  at page 13. This Court indicated that Green could testify about the cases which had been

11  raised by Plaintiff. However, as to Defendants' intent to bring out <u>all</u> of the prior claims and

12  litigation, the Court could not see the purpose and further cautioned the defense that, should

13  they elect to do so, it would open the door for the Plaintiff to respond to that evidence and

14  comment on it later. In that end, however, the Court did <u>not</u> enter any ruling barring Green

15  form testifying as to prior claims and lawsuits against Novelty. <u>Id.</u> at pages 13-16.

16          Finally, Defendants' argue that this Court erred in allowing the testimony of

17  Marylander because: 1) his FRCP Rule 26 report was not timely served, and 2) his

18  survey/study in regards to the likelihood of confusion was fundamentally flawed. Those

19  issues were addressed by the Court in response to Defendants' motion in limine number 11

20  which it denied. Plaintiff did identify Marylander as an expert and described the scope of

21  his testimony before the Rule 26 deadline and Plaintiff did produce his report well before the

22  cut-off date for expert discovery. As to whether the survey/study was fundamentally flawed,

23  Defendants produced no expert of their own nor any controlling case law which established

24  undisputably that the survey was so defective as to be without evidentiary value or

25  significantly misleading. Moreover, the Defendants had an ample opportunity to bring such

26  purported defects and flaws to the jury's attention during his cross-examination.

27          In sum, there is no erroneous evidentiary ruling which so substantially prejudiced the

28  Defendants so as to warrant a new trial.

### 4. Jury Instructions

Erroneous jury instructions, as well as a failure to give adequate instructions, are grounds for a new trial unless the error is harmless. Murphy v. City of Long Beach, 914 F.2d 183, 187 (9th Cir. 1990). Here, Defendants assert that this Court's jury instructions as to 1) "willfulness" for purposes of copyright infringement, and 2) the adverse inference instruction as to Exxon were improper.

As to willfulness, this Court in Jury Instruction No. 52 stated that "An infringement is 'willful' if the infringer knows that its conduct is an infringement or if the infringer has acted in reckless disregard of the copyright owner's rights." That language differs from Ninth Circuit Instruction No. 17.27 by the addition of "reckless disregard" as a basis for finding willfulness. This Court's reasoning for that addition is discussed at length in Section II(A)(3) at pages 9 through 13, above. This Court believes that it (and the Second, Seventh, Eighth and Federal Circuits plus Nimmer) is right in this regard.

As to Exxon, in Jury Instruction No. 12, the Jury was told that, because Exxon had failed to respond to a trial subpoena to produce an individual as to two specified topics[21] they could (but were not required) to infer that the witnesses' testimony on those topics would have been adverse to Exxon. The background and discussion of this issue is somewhat complicated. See e.g., pages 12-18 of May 30 MSTT and pages 52-57 of May 31 ASTT. To summarize, as to the two topics, there was no dispute that in fact Exxon did sell Novelty's two Infringing Products at its convenience stores and Novelty had already proffered into evidence an exhibit  indicating: 1) how many of the items Exxon had sold, 2) the price Exxon paid to Novelty for them, and 3) the sales price at which Exxon sold them. See Id. at pages 54-55. This Court still believes that Instruction No. 12 is correct in the context of this case. For example, in Community Hospitals of Central Calif. v. NLRB, 335 F.3d 1079, 1086-87 (D.C. Cir. 2003), it was held:

---

[21]   The two specified topics were: 1) the sale of Novelty's Shoot Copter and Pull-n-Launch toys at Exxon's convenience stores and 2) Exxon's revenues and profits with respect to those toys.

Although Community contends that the decision not to recognize the Union was made by its board of directors, there is no direct evidence in the record indicating when, how, or even whether the directors made such a decision, or indeed ever considered the matter. In the absence of any such evidence, which is peculiarly within Community's control and which the General Counsel had subpoenaed - the ALJ was justified in inferring that if produced, the evidence would have been unfavorable to the employer. *Cf.* United States v. Young, 150 U.S. App. D.C. 98, 463 F.2d 934, 939 (D.C. Cir. 1972) ("if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it permits an inference that the testimony, if produced, would have been unfavorable").

Additionally, even if one were to find that the instruction was erroneous, it was harmless. As noted above, there was no dispute that Exxon did sell Novelty's Infringing Products. The jury found that Exxon did not willfully infringe Plaintiff's rights. Moreover, the damages awarded against Exxon were: 1) the statutory minimum for copyright infringement and 2) Exxon's profits attributed to trade dress infringement which were clearly based on the exhibits already proffered by Novelty. It is clear that Exxon was not prejudiced by Instruction No. 12.

### 5. **Verdict Form**

Defendants contend that the Verdict Form submitted to the jury was defective because it failed to include the following four questions requested by the Defendants: 1) whether "the shape of the toy is 'functional,' or not functional?", 2) whether Plaintiff proved that "the defendant infringed by making substantially similar copies *of the copyrighted elements* of the registered work," 3) whether Plaintiff proved "that the trade dress in of [sic] the product, *is distinctive*, and 4) whether Plaintiff proved that the trade dress [for their toy or packaging] is non-functional. However, the jury instructions clearly covered those topics such that the jury was informed that they could not find infringement in the first place if the toys/packaging had only non-distinct or merely functional elements, and/or if Defendants only copied those portions of the toys/packaging which were functional or generic. Therefore, the Verdict Form did not remove any material issues from the jury's consideration.

For example, as to the functionality issue in relationship to copyrights, the jury was

told in Instruction No. 27 that:

> Copyrighted work can be a sculptural work such as a toy or a pictorial/graphic work such as the packaging which contains the toy.
>
> Facts, ideas, procedures, <u>purely functional features</u>, processes, methods of operation, concepts, or discoveries <u>cannot themselves be copyrighted</u>.
>
> Sculptural works of artistic craftsmanship such as toys receive copyright protection only insofar as their form <u>but not their mechanical or utilitarian aspects</u> are concerned. The design of a useful or functional object which is ordinarily not copyrightable can be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such a design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article. Accordingly, <u>any aspects of a work that are purely functional, utilitarian or mechanical, will not be given any copyright protection</u>. [Emphasis added.]

As to the subjects of copying and substantial similarity, the jury was informed in Instruction No. 23 that: Defendants "contend that any similarities between their products and Plaintiff's products are as to functional elements which are not copyrightable." Instruction No. 34 indicated that in deciding whether works are substantially similar, "it is important to only consider the copyrightable portion of Plaintiff's works." "Likewise, as to the trade dress infringement, the jury was told that Plaintiff had the burden of proving that its purportedly copied designs were "distinctive" and "nonfunctional" and that, if Plaintiff failed to establish those elements, the jury could not make a finding of infringement.

### 6. **Remittitur**

While Defendants have raised a "suggestion" of remittitur, they have not stated any appropriate grounds for it. For example, they have not sought to establish that the jury's award is <u>grossly</u> excessive,[22] clearly not supported by evidence, or based merely upon speculation. <u>See generally</u> <u>Del Monte Dunes at Monterey, Ltd. v. City of Monterey</u>, 95 F.3d 1422, 1435 (9th Cir. 1996). Additionally, Defendants in essence seek a $156,600 reduction which would primarily negate the award of statutory damages for the copyright infringement.

---

[22] While Defendants characterize the award as "excessive," normally remittitur is not applicable unless the award is "grossly excessive" or "monstrous".

1  Again, however, they fail to articulate a reason for doing so.

2  **7. Conclusion**

3  For the reasons stated above, Defendants' motion for a new trial is denied.

4

5  **D. Motion For Award Of Attorney's Fees And Non-Taxable Costs**

6  **1. Applicable Law**

7  Plaintiff now seeks attorney's fees in the sum of $914,562.12 and non-taxable costs

8  in the amount of $147,630.88.[23]

9  17 U.S.C. § 505 provides that "In any civil action under this title, the court in its

10  discretion may allow the recovery of full costs by or against any party . . . . [and] may also

11  award a reasonable attorney's fee to the prevailing party . . . ." As noted in Fogerty v.

12  Fantasy, Inc., 510 U.S. 517, 534 (1994), "there is no precise rule or formula for making these

13  determinations," but instead equitable discretion should be exercised 'in light of the

14  considerations we have identified.' Henley v. Eckenhart, 461 U.S. 424, 436-37 (1983)."

15  Among the factors cited by the courts are the degree of success obtained, "frivolousness,

16  motivation, objective unreasonableness (both in the factual and in the legal components of

17  the case) and the need in particular circumstances to advance considerations of compensation

18  and deterrence." See e.g. Fogerty, 510 U.S. at 534 n. 19; Entertainment Research Group v.

19  Genesis Creative Group, Inc., 122 F.3d 1211, 1229 (9th Cir. 1997). "The policies served by

20  the Copyright Act are more complex, more measured, than simply maximizing the number

21  of meritorious suits for copyright infringement." 510 U.S. at 534.

22  Likewise, pursuant to 15 U.S.C. § 1117(a), the court may "in exceptional cases" award

23  reasonable attorney's fees and costs. While the term "exceptional" is not defined in the

24  statute, caselaw establishes that such fees and costs can be awarded where the acts of

25  infringement are shown to be malicious, fraudulent, deliberate or willful. Rio Properties v.

26

27

28  [23] Plaintiff's present sums are based on its initial motion filed on June 18, 2007 and supplemented (and "corrected") by a filing on October 3, 2007 for the fees and costs incurred post verdict.

1  Rio International Interlink, 284 F.3d 1007, 1023 (9th Cir. 2002).

2        **2. Discussion**

3          **a. Award of Attorney's Fees and Nontaxable Costs Under**

4            **17 U.S.C. § 505**

5      Initially, while the Plaintiff did not succeed on all of its copyright claims[24], it did

6  prevail on enough of them for the Court to find that it is the prevailing party for purposes of

7  17 U.S.C. § 505.

8      This Court will <u>not</u> award attorneys fees or non-taxable costs against Defendant

9  Exxon.  The jury found that Exxon was an innocent infringer of Plaintiff's copyrights.  The

10  jury only awarded the Plaintiff the minimum statutory damages of $200 which, under Jury

11  Instruction No. 41, indicates that they found that Exxon was not aware of and had no reason

12  to believe its acts constituted a copyright infringement.  Also, the jury found that $0 of

13  Exxon's profits were attributable to Exxon's copyright infringement.  In light of the factors

14  discussed in Fogerty, 510 U.S. at 534, the policies incorporated into the Copyright Act would

15  not be served or advanced by the imposition of attorney's fees and non-taxable costs on

16  Exxon.

17      As to the Novelty Defendants, the Court will award attorney's fees and non-taxable

18  costs to the extent discussed below.  As noted above, Plaintiff was the prevailing party on

19  a majority of the copyright claims involved herein.  During the litigation, the Defendants did

20  at times raise objectively reasonable legal and factual arguments, e.g., whether "reckless

21  disregard" can be a basis for a finding of willful infringement; and the extent to which the

22  handle of the Wild Copter/Prop Shots Toy Helicopter contained graphic or sculptural

23  features which could be identified separately from and existed independently of its non-

24  copyrightable utilitarian aspects.  Conversely, however, the Novelty Defendants also

25  frequently took positions that made no sense or adopted litigation tactics that simply and

26

27      [24]   Judge Snyder granted Defendants' motion for partial summary judgment as to Plaintiff's claim for unfair
competition based on copyright infringement and on its claims of copyright infringement as to the packaging for the

28  Stunt Plane, High Flyer, and Wild Copter Toys.  See page 31 of 2/8/07 Order.

1   unjustifiably increased the time and costs involved in the lawsuit.[25]  Additionally, the jury

2   found that the infringements by the Novelty Defendants were willful.  Finally, in JCW

3   Investments, Inc. v. Novelty, Inc., 482 F.3d 910, 920 (7th Cir. 2007), it was noted there that

4   "'the case took on a life of its own unnecessarily and litigiously,' observing that Novelty

5   unnecessarily increased the fees sought by 'contesting practically every issue.'"  The same

6   observation can be made regarding the Novelty Defendants' litigation tactics herein.

7   **b.  Award of Attorney's Fees and Nontaxable Costs Under**

8   **15 U.S.C. § 1117(a)**

9       The award of attorney's fees and non-taxable costs under 15 U.S.C. § 1117(a) (for

10   trade dress infringement) is under a different criteria than such awards under 17 U.S.C. §

11   505 (for copyright infringements).  While both statutes give the district court wide discretion,

12   the award under Section 1117(a) is limited to "exceptional cases" where "the infringement

13   is malicious, fraudulent, deliberate or willful," see Stephen W. Boney, Inc. v. Boney

14   Services, Inc., 127 F.3d 821, 825-26 (9th Cir. 1997).  Under Section 505, the award must

15   merely further the underlying purposes of the Copyright Act in the sound discretion of the

16   district court and that "discretion is not cabined by a requirement of culpability on the part

17   of the losing party."  Entertainment Research Group, 122 F.3d at 1228-29, quoting Fantasy,

18   Inc. v. Fogerty, 94 F.3d 553, 555 (9th Cir. 1996).  Thus, it is not unusual for attorney's fees

19   to be granted under section 505 and denied under Section 1117(a) for similar conduct.  See,

20   _____

21       [25]   For example, in March of 2006, the Defendants made offers of judgment (see Offer of Judgment filed on April
5, 2006 which states in paragraph 1: "These offers of judgment are being made . . . .") which included, as to Novelty

22   Wholesale and Novelty Transportation, that they would, without admitting liability or damages, consent to a judgment
for $1 and an order enjoining them from selling or offering for sale the Shoot Copter, the Pull-n-Launch Plane Set

23   "or any toy product or packaging that infringes an intellectual property right of Lanard."  Plaintiff agreed to those
offers as to Novelty Wholesale and Novelty Transportation and in April 2006 a judgment to that effect was signed

24   by Judge Snyder.  Subsequently, Defendants moved to vacate the judgment on the basis that the offers were intended
to be a single combined offer as to all of the Defendants.  Judge Snyder agreed and vacated the judgment.  While this

25   judicial officer  will not comment on Judge Snyder's ruling, it appears that the Defendants' motion to vacate that
judgment was non-sensical in practical terms.  Both Novelty Wholesale and Novelty Transportation were dismissed

26   for sum of one dollar each without any concomitant admission of liability, and with an injunction containing the
language proposed by their own counsel.  Instead of leaving that situation alone and without any apparent benefit or

27   advantage to any party, the Defendants elected to have Novelty Wholesale and Novelty Transportation placed back
in the lawsuit to litigate for more than another year to the point of an adverse jury verdict for many thousands of

28   dollars against them.

1   e.g., Twin Peaks Productions v. Publications Intern., 996 F.2d 1366, 1382-83 (2nd Cir.

2   1993).

3       Exxon was found by the jury to not have engaged in intentional or willful trade dress

4   infringement.  This Court agrees with that finding and hence there is no basis for an award

5   of attorney's fees or non-taxable costs against it under Section 1117(a).

6       While the jury did find intentional and willful trade dress infringement by the Novelty

7   Defendants, that finding is not controlling because: 1) the question as to whether a case falls

8   within Section 1117(a)'s definition of "exceptional" is a question of law for the district court,

9   and 2) a jury's finding that a defendant "intentionally infringed" does not necessarily equate

10  with the extent of improper conduct required to bring a case within the scope of that statute.

11  Watec Co. v. Liu, 403 F.3d at 645, 656 (9th Cir. 2005).

12      As noted in Stephen W. Boney, Inc., 127 F.3d at 826-27, in defining "exceptional,"

13  the terms "malicious, fraudulent, deliberate or willful" refer "to the nature of the defendant's

14  infringement in a case where the plaintiff prevails."  The protection afforded to trade dress

15  (like trademarks) is to avoid "a likelihood of confusion on the part of ordinary customers as

16  to the source or association of . . . [particular] good or services."  Two Pesos, Inc., 505 U.S.

17  at 766.  Therefore, the malicious, fraudulent, deliberate or willful conduct must relate in

18  some fashion to the intent or the effort to create some confusion in regards to source of goods

19  and services.  Consequently, "deliberate copying does not make a case per se exceptional."

20  Pebble Beach Co. v. Tour 18 I Ltd., 155 F.3d 526, 556 (5th Cir. 1998).  Also, in that regard,

21  "lack of damages is an important factor in determining whether a case is exceptional."  Id.

22      This Court finds that this action is unexceptional for purposes of Section 1117(a).

23  While it is sufficiently clear that Plaintiff's trade dress was copied by someone or entity

24  associated with the Novelty Defendants, there is insufficient evidence to conclude that that

25  copying was intended to confuse the public as to the origin of the products.  Moreover, the

26  jury found that Plaintiff suffered $0 in actual damages resulting from Defendant's

27  infringement of its trade dress - at least because any damages would be duplicative of

28  amounts already awarded under Plaintiff's copyright claim.

1    In sum, the Court will not award attorney's fees or non-taxable costs under 15 U.S.C.

2  § 1117(a).

3    ### c. Calculation of Attorney's Fees and Non-Taxable Costs

4    #### i) Attorney's Fees

5    The normal starting point for the calculation of attorney's fees is the "lodestar"

6  method which takes the attorney's reasonable hourly rate, multiplies it by the number of

7  hours reasonable spent and adjusts that amount by various factors.  See JCW Investments,

8  Inc., 482 F.3d at 917-21.  Where, as here, an award is made under the Copyright Act but not

9  under the Lanham Act and/or other claims, an appropriate apportionment of fees is required.

10  See Twin Peaks Productions, Inc., 996 F.2d at 1383.  Furthermore, in considering the time

11  spent by the attorneys, the court can deduct or discount hours spent on duplicative,

12  unsuccessful or unproductive work.

13    Initially, the Court finds the hourly rates charged by Plaintiff's counsel (i.e., for

14  partners between $305 and $350, for associates between $150 and $275, and for paralegals

15  $150) to be reasonable and well within the range of fees normally charged by attorneys from

16  Los Angeles law firms which are about the size of Gordon & Rees, LLP.[26]

17    Second, the Court finds that the evidence submitted as to the hours expended by the

18  attorneys and paralegals to be sufficiently delineated as to the nature of the work performed

19  in the billing statements which were sent to the Plaintiff as included in Exhibit C to the

20  Declaration of Craig J. Miriam attached to the Motion for Award of Attorney's Fees and in

21  Exhibit A to the Supplemental Declaration in Support of Plaintiffs' [sic] Motion for an

22  Award of Attorney's Fees (henceforth "Billing Statements").  Further, the Court finds that

23  there is sufficient evidence to believe that the attorneys/paralegals did in fact spend the

24  indicated time doing what is described in the Billing Statements.

25

26    [26]  The undersigned judicial officer had been a Los Angeles Superior Court Judge from 1996 to April 2007 and

27  has been a federal district court judge in the Central District of California since the latter date.  I have reviewed
literally hundreds of attorney's fees applications with concomitant declarations and have had many trials where the

28  reasonableness of the attorney's fees charged was at issue.

However, this Court believes that the total amount of hours must be substantially reduced.  First, as noted above, Plaintiff was not successful on all of its copyright claims and hence attorney's fees should be deducted for that unsuccessful effort.   Second, since attorney's fees are not being awarded as to Plaintiff's trade dress claims under the Lanham Act, there has to be an apportionment.   Third, it is noted that there are over 750 docket entries in this case.  To say that this matter was over-litigated by both sides in this action would be a gross understatement.  Blame for that situation is placed on counsel on both sides.  Attorney fees should not be awarded for such over-litigation.  Fourth, there are certain items in the Billing Statements which are questionable in terms of any award.[27]

The problem with calculating reasonable attorney's fees in the present context arises from the deduction and apportionment that must be done.  When work is done, virtually no attorney keeps his or her time records according to particular claims or causes of action.  As noted by the Supreme Court in Hensley v. Eckerhart, 461 U.S. 424, 435 (1983), there will be cases where "[m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expanded on a claim-by-claim basis."  In such situations, an "across-the-board" percentage deduction can be employed, if it is carefully done and adequately explained.  See Id. at 438 n. 13; Cairns v. Franklin Mint Co., 292 F.3d 1139, 1157-58 (9th Cir. 2002).  As stated in Gates v. Deukmajian, 987 F.2d 1392, 1399 (9th Cir. 1992):

> Despite the "concise but clear" requirement, in cases where a voluminous fee application is filed in exercising its billing judgment the district court is not required to set forth an hour-by-hour analysis of the fee request . . . . [W]hen faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure "as a practical means of trimming the fat from a fee application. [Citations and footnote omitted.]

Here, after considering all of the factors discussed above, the Court concludes that

---

[27]   For example, Plaintiff's counsel Gordon & Rees LLP has offices in Los Angeles and San Diego.  This Court would question the propriety of claiming attorney's fees for travel for multiple attorneys from San Diego to appear in Los Angeles for "minor hearings" such as a discovery dispute.  See e.g., entries for "2/23/07" in the Billing Statement.

Plaintiff's counsel's fees should be cut by more than 50%.  The Court will reduce Plaintiff's attorney's fees request by 60%.  Therefore, the court will award attorney's fees in the sum of ($914,562.13 x .40=) $365,824.88.

### 2. Non-Taxables Costs

Initially, the Court rejects Defendants' contention that "non-taxable costs not falling within 28 U.S.C. §§ 1920 and 1821" may not be awarded herein because there is no evidence of congressional intent to permit such recovery.  Indeed, in one of the cases cited by Defendants themselves, the Ninth Circuit states that "we hold that district courts may award otherwise non-taxable costs, including those that lie outside the scope of § 1920, under § 505."  See Twentieth Century Fox Film Corp. v. Entertainment Distributing, 429 F.3d 869, 885 (9th Cir. 2005).

Plaintiff indicates that it is seeking non-taxable costs for: 1) paralegal and law clerk fees, 2) telephone charges, 3) fax charges, 4) postage, 5) legal research, 6) travel charges, 7) messenger services, 8) trial transcripts and 9) experts' fees.  Certain of those items will not be awarded or will be substantially reduced.  First, as conceded by Plaintiff, charges for paralegal and law clerk work was included in the attorney's fees application which has already been provided for above.  Thus, no additional amounts for paralegals or law clerks will be charged.  Second, as to expert fees, Plaintiff did not include invoices which total the $46,215.41 claimed.  The invoices for Ann Wilson add up to $8,977.71 and for Marylander Marketing Research equal $15,237.70.[28]  More importantly, however, since Marylander's testimony and survey went only to the issue of trade dress infringement, his fees would not be covered under Section 505 at all.  Thus, only Wilson's charges can be considered.  Third, as conceded by Plaintiff's counsel, the phone charges should have been listed as $9.84 not $984.00, and the total for messenger services should be $2,161.47 rather than the claimed $10,693.22.  Fourth, while not necessarily precluding recovery, it should be noted that the

---

[28] The discrepancy may be explained by the omission of any invoices for the costs of doing the survey which Marylander testified at trial cost about "$24,000 and a few dollars."  See page 77 of May 30 MSTT.

supporting evidence for items 2, 3, 4, 5, 6 and 7 are meager and consist primarily of unexplained computer print-outs with de minimis information.

Based on the above, the Court will only award non-taxable costs after reducing the amount by 60%. Therefore, as to the original non-table costs:

| Category | Original Amount | Includable Amount | 40% Amount |
|---|---|---|---|
| 1. Paralegal/Law Clerk Fees | $44,887.50 | $0 | $0 |
| 2. Telephone Charges | $9.84 | $9.84 | $3.94 |
| 3. Fax Charges | $53.10 | $53.10 | $21.24 |
| 4. Postage | $287.87 | $287.87 | $115.15 |
| 5. Legal Research | $21,290.13 | $21,290.13 | $8,516.05 |
| 6. Travel Charges | $7,082.72 | $7,082.72 | $2,833.09 |
| 7. Messenger Services | $10,693.22 | $2,161.47 | $864.59 |
| 8. Trial Transcripts | $7,803.62 | $7,083.62 | $3,121.45 |
| 9. Expert Fees | $46,215.41 | $8,977.71 | $3,591.08 |
| | | Total: | $19,066.59 |

In addition, there were additional non-taxable costs post verdict in the sum of $17,833.22 which after a 60% reduction equals $7,133.29.

Therefore, the Court will award Plaintiff non-taxable costs in the sum of $26,199.88.

**E. Motion To Strike Plaintiff's Bill Of Costs And To Retax Costs**

Plaintiff submitted a Bill of Costs in the sum of $57,216.84 after the Judgment in this case was entered. On August 27, 2007, the Defendants filed Objections to Plaintiff's Bill of Costs. Plaintiff filed a Reply to those Objections on September 6, 2007. The Clerk of the Court taxed costs in the sum of $33,348.64.

Defendants now move to strike Plaintiff's Bill of Costs because it purportedly contains material misrepresentations. Defendants specifically cite to only 3 items as being made "falsely": 1) two court reporter invoices for $1,360.75 and $1,572.95 which Defendants charge were credited back to Plaintiff by the reporting service; 2) a check for $580 to the

Register for Copyrights which was refunded by the government, and 3) witness fees for $3,160 where the checks were not cashed by the witnesses. Plaintiff explains that the reason for the refund from the reporting service was that Plaintiff had inadvertently paid the court reporter twice. As to the uncashed checks for the witness fees, there is no evidence that the checks were not in fact issued. The mere fact that they have not been cashed does not make Plaintiff's inclusion of them in the Bill of Costs improper or intentionally false.[29] This Court finds that Defendants have not established that Plaintiff intentionally (or recklessly) submitted false information in its Bill of Costs.

Defendants also raise a number of arguments which are, to put it bluntly, borderline frivolous. For example, they contend that Plaintiff is not the prevailing party for purposes of taxing costs. It clearly is.

Defendants also raise a number of contentions asserting that certain requested costs are not allowable or that Plaintiff failed to present sufficient evidence to warrant its award. However, as noted above, the Clerk of the Court already reduced Plaintiff's claimed costs from $57,216.84 to $33,348.64. Even if one were to assume that Defendants contested points were correct (which this Court does not), the disputed charges would not amount to nearly the sums already disallowed by the Clerk.

In sum, the motion to strike Plaintiff's Bills of Costs and to retax costs is denied.

## III.    CONCLUSION

For the reasons stated above: 1) Defendants' motion for judgment as a matter of law is denied in its entirety; 2) Defendants' motion to alter or amend judgment is granted as to certain language used in the Judgment, but is otherwise denied; 3) Defendants' motion for a new trial is denied in its entirety; 4) Plaintiff's motion for attorney's fees and for non-taxable costs is granted under 17 U.S.C. § 505 as to the Novelty Defendants in the sums delineated herein, and denied under 15 U.S.C. § 1117(a) as to all Defendants; and 5) Defendants' motion to strike the Bill of Costs and to retax cost is denied. The Court will

---

[29]    Plaintiff does not directly address the purported refunded $580 from the government.

1  issue an Amended Judgment forthwith.

2

3  DATED:   This 18th day of March, 2008

4

GEORGE H. WU
United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28